PHILIP B. SEATON
LAW OFFICE OF PHILIP B. SEATON
One Greentree Centre
10000 Lincoln Drive East, Suite 201
Marlton, New Jersey 08053
(856) 988-5516

Attorney for Debtor
North Connections Logistics, Inc.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | | | |
|---|---|---|---|
| In re: | : | Case No.: | 12-30629 |
| NORTH CONNECTIONS LOGISTICS, INC. | : | Judge: | KCF |
| | : | Chapter: | 11 |
| Debtor | : | | |
| NORTH CONNECTIONS LOGISTICS, INC. | : | | |
| Plaintiff, | : | Adv. Pro. No. | |
| v. | : | | |
| CSX TRANSPORTATION, INC. | : | **ADVERSARY COMPLAINT** | |
| Defendant. | : | | |

Plaintiff North Connections Logistics, Inc. files this Adversary Complaint and alleges as follows against Defendant CSX Transportation, Inc.:

## PARTIES

1.      Plaintiff North Connections Logistics, Inc. ("NCL") is the debtor in the above-captioned bankruptcy proceeding by virtue of having filed a voluntary petition for relief under chapter 11 of title 11 United States Code ("Bankruptcy Code") on August 20, 2012.

2.      Defendant CSX Transportation, Inc. ("CSX") is a Virginia corporation with its principal place of business in Florida.

## JURISDICTION & VENUE

3.      This Court has jurisdiction to hear this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157.

4.      Venue is proper in this Court under 28 U.S.C. § 1409.

## BACKGROUND

5.      NCL is an African-American owned business. Its officers and management team are also African-American.

6.      On July 1, 2009, NCL and CSX entered into a written contact called the CSX Transportation Agreement System Agreement ("Agreement").

7.      Before this time, W&W Transportation, a predecessor company to NCL with the same management team, provided the same services to CSX for eight years under contractual terms that were not materially different than those in the Agreement.

8.      Under the Agreement, NCL agreed to provide taxi services that were previously provided by W&W and transport CSX's railroad crews to and from locations as requested by CSX. NCL's service area included portions of Pennsylvania, New Jersey, New York, and Massachusetts.

9. Under the Agreement, CSX would communicate to NCL the location and "need time" for a requested pick up.

10. The Agreement required that CSX make "reasonable efforts" to provide NCL with at least two-hours of lead time for a pick up so that there would be time for NCL to determine which driver to dispatch and for that driver to safely travel to the pickup location. Two hours' lead time was necessary in light of the heavy traffic patterns and congestion in the large metropolitan areas that were included in NCL's service area and to maintain safety.

11. Any pick up request by CSX that provided for less than one hour of lead time was termed an "ASAP Call" under the Agreement.

12. For non-ASAP calls, NCL would be deemed on time if it arrived at the requested pick up location no later than five minutes after the requested need time. Thus, for non-ASAP calls, NCL had two hours and five minutes to arrive at the requested pick up location.

13. For ASAP calls, NCL would be deemed on time if it arrived at the requested pick up location no later than one hour and five minutes after the requested need time. Thus, for ASAP calls, NCL had one hour and five minutes to arrive at the requested pick up location.

14. Under the Agreement, the failure to maintain on-time performance with respect to 90% of the pickups NCL made in any one-month period was considered a material breach.

15. The term of the Agreement was from July 1, 2009, to June 30, 2014.

16. If CSX deemed NCL's taxi services unsatisfactory, it could terminate the Agreement, provided it gave NCL fourteen days to cure the alleged breach. If the breach was not cured within 14 days, then CSX could terminate the Agreement effective upon 120 days prior written notice.

17.     CSX permitted NCL to establish a call center to administer the Agreement in a CSX facility located in Selkirk, New York.

18.     In or about 2009, there was a change in managers at CSX who oversaw and/or administered the Agreement in Selkirk.  The new manager was John Gaylord.

19.     Prior to Mr. Gaylord, there were no documented material problems with NCL's, and before that W&W's, performance.  CSX made good faith reasonable efforts to provide NCL with two hours' lead time and would meet with NCL on a regular basis to give it advance notice of instances where it expected increased demand so that NCL could pre-position its resources.  That all changed when Mr. Gaylord assumed the management position in Selkirk in 2009.

20.     Most of the drivers that NCL used to service the Agreement with CSX were minorities.

21.     NCL would interview drivers in the facility it shared with CSX in Selkirk, New York.  When NCL would bring in a minority applicant to the Selkirk facility to interview, if encountered by Mr. Gaylord, it would not be uncommon for him to role his eyes or make some other gesture indicating dissatisfaction.  On more than one occasion, and without reason or justification, Mr. Gaylord would derogatorily make note of the fact that NCL utilized primarily minority drivers.

22.     NCL's CEO, who is African-American, would on countless occasions travel from his office in Hainesport, New Jersey to meetings with John Gaylord at the Selkirk facility only to show up for the meeting to discover with no advanced notification that Mr. Gaylord was not there or otherwise unwilling to meet.

23.     Inexplicably, at about the same time, CSX was increasingly providing NCL with less than two hours' lead time, giving NCL an hour and five minutes, rather than two hours and

five minutes, to make the requested pickup on time. Soon, the near majority of calls NCL received from CSX were ASAP calls or calls where less than two hours' lead time was given. Throughout the contract period, NCL operated as the de facto exclusive vendor for the contracted territory. As a result, and based on the mutual understanding that ASAP calls were to be the exception and not the rule, NCL contracted with outside cab/transportation companies to accommodate the ASAP calls, even though this arrangement was financially disadvantageous to NCL. When asked about the increased number of ASAP calls, Gaylord advised that one hour and five minutes was the new standard against which NCL's on time performance would be based.

24.     At the same time, NCL employees and agents began hearing rumors from the CSX train crews they were transporting that Mr. Gaylord was out to get them (NCL) and that NCL would not be around much longer.

25.     In October 2011, NCL met with CSX officials in Jacksonville, Florida, to discuss its concerns regarding Mr. Gaylord and his unilateral implementation of the one-hour-five-minute performance standard.

26.     A member of the CSX management team advised that he could not get into the details but suggested that Mr. Gaylord's actions were racially motivated and that NCL should file an internal complaint against Mr. Gaylord. Not wanting to inflame the situation, NCL did not file an internal complaint with CSX.

27.     The situation with Mr. Gaylord, however, did not improve. CSX was requesting more and more pickups without giving NCL two-hour' lead time. For nearly half of the requested pick-ups, CSX gave NCL less than two hours' lead time.

28. In addition, whereas in the past, CSX would communicate in advance locations where it anticipated increased activity and thus an increased need for NCL's services so that NCL could pre-position resources to meet the increased demand, Mr. Gaylord ceased all such communications with NCL. As a consequence, NCL was unable to pre-position resources to meet the variability in demand that CSX commonly experienced.

29. Having set NCL up for failure, in a letter dated February 22, 2012, CSX advised NCL that it was failing to perform under the Agreement and that CSX intended to engage an alternative vendor to supply the taxi services provided by NCL. In response, on March 26, 2012, NCL sent an email to CSX indicating that, based upon the two-hour lead time standard in the Agreement, its performance was better than 90% and requested "another look" at the metrics, but NCL received no response from CSX.

30. For the months that followed, CSX continued to provide less than two hours' lead time for a near majority of the requested pickups.

31. In addition, Mr. Gaylord evicted NCL from the facility it was sharing with CSX in Selkirk to administer the Agreement on the basis that NCL's office allegedly smelled and was dirty. The same cleaning crew that cleaned the CSX facility, however, also routinely cleaned the space that NCL used.

32. In a letter dated July 9, 2012, CSX advised that it was providing notice of its intent to terminate the Agreement as a result of NCL's alleged failure to meet the 90% on time standard.

33. In a letter dated August 13, 2012, CSX advised NCL that it was terminating the Agreement effective 120 days and that, in the meantime, it would not be requesting future

services from NCL under the Agreement. CSX advised that it had secured a new vendor to replace CSX. That vendor is a non-minority-owned business.

## COUNT ONE

34. NCL incorporates by reference the allegations contained in paragraphs 1 through 33 above.

35. NCL is a corporation and thus a "person" as defined in N.J.S.A. § 10:5-5.

36. CSX is a corporation and thus a "person" as defined in N.J.S.A. § 10:5-5

37. In relevant part, N.J.S.A. § 10:5-12(*l*) provides that it shall be "unlawful discrimination" for "any person to refuse to buy from, sell to, lease from or to, license, contract with, or trade with, provide goods, services or information to, or otherwise do business with any other person on the basis of race, creed, color, national origin, ancestry, age, sex . . . of such other person or of such other person's spouse, partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers, or customers."

38. CSX terminated the Agreement and refused to do business with NCL on account of the race, creed, color, national origin, or ancestry of the owners, officers, employees, agents, or business associates of NCL in violation of N.J.S.A. § 10:5-12(*l*). CSX purposely provided NCL with less than two hours' lead time and withheld information about instances where it expected increased demand so that it could manufacture a breach and use it as a pretext to terminate the Agreement with NCL.

39. NCL has suffered damages as a result of CSX violation of N.J.S.A. § 10:5-12(*l*).

40. CSX's actions were wanton, egregious, and/or willful.

WHEREFORE, Plaintiff North Connections Logistics, Inc. demands judgment in is favor and against Defendant CSX Transportation, Inc. for direct and compensatory damages, punitive damages, attorneys' fees, costs, interest, reinstatement of the Agreement for the remainder of its terms, and such other relief the Court deems equitable and just.

Dated:  September 27, 2012
　　　　　　　　　　　　　　　　　　　　*/s/ Philip B. Seaton*
　　　　　　　　　　　　　　　　　　　　PHILIP B. SEATON
　　　　　　　　　　　　　　　　　　　　LAW OFFICE OF PHILIP B. SEATON
　　　　　　　　　　　　　　　　　　　　One Greentree Centre
　　　　　　　　　　　　　　　　　　　　10000 Lincoln Drive East, Suite 201
　　　　　　　　　　　　　　　　　　　　Marlton, New Jersey 08053
　　　　　　　　　　　　　　　　　　　　(856) 988-5516

　　　　　　　　　　　　　　　　　　　　Attorney for Debtor
　　　　　　　　　　　　　　　　　　　　North Connections Logistics, Inc.