## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | | |
|---|---|---|---|
| In re: | : | Case No.: | 12-30629 |
| | : | | |
| NORTH CONNECTIONS | : | Judge: | KCF |
| LOGISTICS, INC. | : | | |
| | : | Chapter: | 11 |
| Debtor | : | | |

| | | |
|---|---|---|
| NORTH CONNECTIONS | : | |
| LOGISTICS, INC. | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. 12-1979 |
| | : | |
| v. | : | |
| | : | |
| CSX TRANSPORTATION, INC. | : | **ORAL ARGUMENT** |
| | : | **REQUESTED** |
| Defendant. | : | |

## PLAINTIFF NORTH CONNECTIONS LOGISTICS, INC.'S BRIEF IN OPPOSITION TO DEFENDANT CSX TRANSPORTATION, INC.'S MOTION TO DISMISS

PHILIP B. SEATON
LAW OFFICE OF PHILIP B. SEATON
One Greentree Centre
10000 Lincoln Drive East, Suite 201
Marlton, New Jersey 08053
(856) 988-5516

JEFFREY D. VANACORE
PERKINS COIE
30 Rockefeller Plaza, 25th Floor
New York, New York 10112
(212) 262-6900

*Attorneys for Plaintiff*
*North Connections Logistics, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

FACTS .................................................................................................................2

ARGUMENT .......................................................................................................9

I. NCL's LAD Claim Is Not Subject To Arbitration Because It Falls Outside The Scope Of The Arbitration Clause ...........................................................9

    A. The Decision Whether To Arbitrate, And The Scope Of Claims Subject To Arbitration, Are Matters Of Contract Determinable By The Parties .........................................................................................11

    B. Like Other Contracts, Arbitration Agreements Are Interpreted In Accordance With State Law ................................................................12

        1. Because There Is No Ambiguity, The Presumption of Arbitrability Does Not Apply ...................................................13

        2. The Supreme Court Has Never Adopted A "Touch" Test For Interpreting The Scope Of An Arbitration Clause. Rather, Matters Of Interpretation Are Resolved In Accordance With State Law .................................................................................15

    C. As Interpreted Under Florida Law, The Agreement Does Not Require The Arbitration Of The LAD Claim .....................................20

        1. Florida, Not New Jersey, Law Governs The Interpretation Of The Parties' Agreement. ...........................................................20

        2. Florida Has Interpreted "Arising Under" Or "Related To" To Only Require Arbitration Of Disputes Concerning Contractually-Imposed Duties .................................................20

        3. NCL's LAD Claim Is Not A Dispute "Arising Out Of Or Connected With Any Default Or Breach" Of The Agreement .................................................................................23

II. Venue In This District Is Proper Because The Florida Forum Selection Clause Does Not Apply. NCL's LAD Claim Is Not An Action "Arising From, Or Brought To Enforce," The Parties' Agreement .............................25

i

III.    NCL Has Stated A LAD Claim That Passes The *Twombly/Iqbal*
        Plausibility Standard ...................................................................................29

        A.      The "Prima Facie Case" Is Not A Pleading Standard .........................29

        B.      NCL Has Stated A Plausible Claim That CSX Refused To Contract
                With It In Violation Of LAD .............................................................31

CONCLUSION .......................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*al-Kidd v. Ashcroft*,
    580 F.3d 949 (9th Cir. 2009) ........................................................................31

*Alvater Gessler v. Sobieski Destylarnia*,
    572 F.3d 86 (2d Cir. 2009) ...........................................................................27

*AT&T Technologies v. Communications Workers*,
    475 U.S. 643 (1986)......................................................................................13

*Barbosa v. Continuum Health Partners Inc.*,
    716 F. Supp. 2d 210 (S.D.N.Y. 2010) ..........................................................31

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 547 (2007) .................................................................30, 33, 35

*Bel-Ray Co. v. Chemrite (Pty) Ltd.*,
    181 F.3d 435 (3d Cir. 1999) .........................................................................14

*Dixon v. Rutgers, The State Univ. of N.J.*,
    110 N.J. 432 (1988) ......................................................................................29

*Dusold v. Porta-John Corp.*,
    807 P.2d 526 (Ariz. Ct. App. 1990) .............................................................22

*EEOC v. Waffle House, Inc.*,
    534 U.S. 279 (2002).........................................................................12, 13, 14

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995).............................................................................12, 13

*Grajales v. Puerto Rico Ports Authority*,
    682 F.3d 40 (1st Cir. 2012)...........................................................................33

*Granite Rock Co. v. International Brotherhood of Teamsters*,
    ____ U.S. ____, 130 S.Ct. 2847 (2010) .............................................14, 15, 24

*Huggard v. Crown Bank*,
    2012 WL 529548 (D.N.J. Feb. 17, 2012)......................................................31

*John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*,
  119 F.3d 1070 (3d Cir. 1997) ................................................................25, 26

*J.T.'s Tire Service v. United Rentals*,
  411 N.J. Super. 236 (App. Div. 2010) ..........................................................32

*Keys v. Humana, Inc.*,
  684 F.3d 605 (6th Cir.2012) ......................................................................31

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985)......................................................................16, 17, 18

*Nationwide Mut. Ins. Co. v. Cosenza*,
  258 F.3d 197 (3d Cir. 2001) ......................................................................10

*Phillips v. Audio Active*,
  494 F.3d 378 (2d Cir. 2007) ......................................................................27

*Rhodes v. R&L Carriers, Inc.*
  ___ Fed. Appx. ___, 2012 WL 3156437 (6th Cir. Aug. 6, 2012) ................35

*Rubin v. Chilton*,
  359 N.J. Super. 105 (App. Div. 2003)..........................................................32

*Seifert v. U.S. Home Corp.*,
  750 So.2d 633 (Fla. 1999) ......................................................20, 21, 22, 23

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
  ____ U.S. _____, 130 S.Ct. 1758 (2010) ....................................................19

*Swierkiewicz v. Sorema N.A.*,
  534 U.S. 506 (2002)..............................................................................2, 29, 30

*U.S. Small Bus. Admin. v. Chimicles*,
  447 F.3d 207 (3d Cir. 2006) ......................................................................14

*Volt Info. Sciences v. Stanford University*,
  489 U.S. 468 (1989)........................................................................12, 18, 19

## Statutes

9 U.S.C. § 3 ..............................................................................................10

N.J.S.A. § 10:5-12(*l*)........................................................................1, 24, 31

# **INTRODUCTION**

Plaintiff North Connections Logistics, Inc. ("NCL") was a minority owned and operated business.  It had a contract with Defendant CSX Transportation, Inc. ("CSX") to provide taxi services in the northeast and ferry CSX's railroad crews from one location to another.  CSX terminated the contract on the ostensible basis that NCL's on-time performance did not meet the performance standards of the contract.  NCL contends CSX's refusal to continue the contract was on account of the race of its workers and drivers, who were predominantly minorities, and has sued CSX under a provision of the New Jersey Law Against Discrimination ("LAD") that makes it unlawful for "any person to refuse to . . . contract with . . . or otherwise do business with any other person on the basis of race, creed, color, national origin, ancestry, age, sex . . . of such other person or of such other person's spouse, partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers, or customers." N.J.S.A. § 10:5-12(*l*)

CSX has moved to dismiss NCL's LAD claim on three separate grounds.

First, CSX contends the LAD claim falls within the scope of the arbitration clause in the parties' contract, which applies to claims "arising out of" the contract. The contract is governed by Florida law, and the Florida Supreme Court has interpreted similar language to require arbitration of only contractually-imposed

1

duties and not of those imposed by law and generally owed to others besides the contracting parties.  The LAD is not a contractually imposed obligation, and therefore NCL's LAD claim is not arbitrable.

Second, CSX contends venue is not proper and that this action should have been brought in Florida in accord with the forum selection clause in the parties' contract.  Similar to the arbitration clause, however, the forum selection clause only applies to claims "arising from" the parties' contract.  Again, this language has been interpreted as only encompassing claims that originate from the parties' contract.  NCL's LAD claim, however, is not based on rights originating from the contract and is thus not subject to the forum selection clause.

Third, CSX contends NCL has failed to state a "prima facie" LAD claim. But as the Supreme Court made clear in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), "[t]he prima facie case . . . is an evidentiary standard, not a pleading requirement."  *Id.* at 510.  NCL has complied with Rule 8 and provided a "short and plain statement" of its claim that, if accepted as true as it must on a motion to dismiss, is facially plausible and gives fair notice to CSX of the basis for the LAD claim.

## **FACTS**

Because this is a motion to dismiss, the following factual allegations from the Complaint must be accepted as true.

2

NCL is an African-American owned business.  Its officers and management team are also African-American.  *See* Compl. ¶ 5.

On July 1, 2009, NCL and CSX entered into a written contact called the CSX Transportation System Agreement ("Agreement").  *See* Compl. ¶ 6.  The term of the Agreement was from July 1, 2009, to June 30, 2014.  *See* Compl. ¶ 15.

Before this time, W&W Transportation, a predecessor company to NCL with the same management team, provided the same services to CSX for eight years under terms that were not materially different from those in the Agreement.  *See* Compl. ¶ 7.

Under the Agreement, NCL agreed to provide taxi services that were previously provided by W&W and transport CSX's railroad crews to and from locations as requested by CSX.  NCL's service area included portions of Pennsylvania, New Jersey, New York, and Massachusetts.  *See* Compl. ¶ 8.  CSX would communicate to NCL the location and "need time" for a requested pick up.  *See* Compl. ¶ 9.

The Agreement required that CSX make "reasonable efforts" to provide NCL with at least two-hours of lead time for a pick up so that there would be time for NCL to determine which driver to dispatch and for that driver to safely travel to the pickup location.  Two hours' lead time was necessary in light of the heavy

traffic patterns and congestion in the large metropolitan areas that were included in

NCL's service area and to maintain safety. *See* Compl. ¶ 10.

Any pickup request by CSX that provided for less than one hour of lead time

was termed an "ASAP Call" under the Agreement. *See* Compl. ¶ 11.

For non-ASAP calls, NCL would be deemed on time if it arrived at the

requested pick up location no later than five minutes after the requested need time.

Thus, for non-ASAP calls, NCL had two hours and five minutes to arrive at the

requested pick up location. *See* Compl. ¶ 12.

For ASAP calls, NCL would be deemed on time if it arrived at the requested

pick up location no later than one hour and five minutes after the requested need

time. Thus, for ASAP calls, NCL had one hour and five minutes to arrive at the

requested pick up location. *See* Compl. ¶ 13.

The failure to maintain on-time performance with respect to 90% of the

pickups NCL made in any one-month period was considered a material breach.

*See* Compl. ¶ 14. If CSX deemed NCL's taxi services unsatisfactory, it could

terminate the Agreement, provided it gave NCL fourteen days to cure the alleged

breach. If the breach was not cured within 14 days, CSX could terminate the

Agreement effective upon 120 days prior written notice. *See* Compl. ¶ 16.

CSX permitted NCL to establish a call center to administer the Agreement in

a CSX facility located in Selkirk, New York. *See* Compl. ¶ 17.

4

In or about 2009, there was a change in managers at CSX who oversaw and/or administered the Agreement in Selkirk. The new manager was John Gaylord. *See* Compl. ¶ 16.

Prior to Mr. Gaylord, there were no documented material problems with NCL's, and before that W&W's, performance. CSX made good faith reasonable efforts to provide NCL with two hours' lead time and would meet with NCL on a regular basis to give it advance notice of instances where it expected increased demand so that NCL could pre-position its resources. That all changed when Mr. Gaylord assumed the management position in Selkirk in 2009. *See* Compl. ¶ 19.

Most of the drivers that NCL used to service the Agreement with CSX were minorities. *See* Compl. ¶ 20. NCL would interview drivers in the Selkirk facility it shared with CSX. When NCL would bring in a minority applicant to the Selkirk facility to interview, if encountered by Mr. Gaylord, it would not be uncommon for him to role his eyes or make some other gesture indicating dissatisfaction. On more than one occasion, Mr. Gaylord would derogatorily make note of the fact that NCL utilized primarily minority drivers. *See* Compl. ¶ 21.

NCL's CEO at the time was African-American. He would on countless occasions travel from his office in Hainesport, New Jersey to meetings with John Gaylord at the Selkirk facility only to show up for the meeting to discover with no

5

advanced notification that Mr. Gaylord was not there or otherwise unwilling to meet. *See* Compl. ¶ 22.

At about the same time, CSX was increasingly providing NCL with less than two hours' lead time, giving NCL an hour and five minutes, rather than two hours and five minutes, to make the requested pickup on time. Soon, the near majority of calls NCL received from CSX were ASAP calls or calls where less than two hours' lead time was given. *See* Compl. ¶ 23.

Throughout the contract period, NCL operated as the de facto exclusive vendor for the contracted territory. As a result, and based on the mutual understanding that ASAP calls were to be the exception and not the rule, NCL contracted with outside cab/transportation companies to accommodate the ASAP calls, even though this arrangement was financially disadvantageous to NCL. *See* Compl. ¶ 23.

When asked about the increased number of ASAP calls, Gaylord advised that one hour and five minutes was the new standard against which NCL's on time performance would be based. *See* Compl. ¶ 23.

At the same time, NCL employees and agents began hearing rumors from the CSX train crews they were transporting that Mr. Gaylord was out to get them (NCL) and that NCL would not be around much longer. *See* Compl. ¶ 24.

In October 2011, NCL met with CSX officials in Jacksonville, Florida, to discuss its concerns regarding Mr. Gaylord and his unilateral implementation of the one-hour-five-minute performance standard.  *See* Compl. ¶ 25.  A member of the CSX management team advised that he could not get into the details, but suggested that Mr. Gaylord's actions were racially motivated and that NCL should file an internal complaint against Mr. Gaylord.  Not wanting to inflame the situation, NCL did not file an internal complaint with CSX.  *See* Compl. ¶ 26.

The situation with Mr. Gaylord, however, did not improve.  CSX was requesting more and more pickups without giving NCL two-hours' lead time.  For nearly half of the requested pick-ups, CSX gave NCL less than two hours' lead time. *See* Compl. ¶ 27.

In addition, whereas in the past, CSX would communicate in advance locations where it anticipated increased activity and thus an increased need for NCL's services so that NCL could pre-position resources to meet the increased demand, Mr. Gaylord ceased all such communications with NCL.  As a consequence, NCL was unable to pre-position resources to meet the variability in demand that CSX commonly experienced.  *See* Compl. ¶ 28.

Having set NCL up for failure, in a letter dated February 22, 2012, CSX advised NCL that it was failing to perform under the Agreement and that CSX

7

intended to engage an alternative vendor to supply the taxi services provided by

NCL.  *See* Compl. ¶ 29.

In response, on March 26, 2012, NCL sent an email to CSX indicating that,

based upon the two-hour lead time standard in the Agreement, its performance was

better than 90% and requested that CSX take "another look" at the metrics.  NCL

received no response from CSX.  *See* Compl. ¶ 29.

For the months that followed, CSX continued to provide less than two

hours' lead time for a near majority of the requested pickups.  *See* Compl. ¶ 30.

In addition, Mr. Gaylord evicted NCL from the facility it was sharing with

CSX in Selkirk on the basis that NCL's office allegedly smelled and was dirty.

The same cleaning crew that cleaned the CSX facility, however, also routinely

cleaned the space that NCL used.  *See* Compl. ¶ 31.

In a letter dated July 9, 2012, CSX advised that it was providing notice of its

intent to terminate the Agreement as a result of NCL's alleged failure to meet the

90% on time standard.  *See* Compl. ¶ 32.

In a letter dated August 13, 2012, CSX advised NCL that it was terminating

the Agreement effective 120 days and that, in the meantime, it would not be

requesting future services from NCL under the Agreement.  CSX advised that it

had secured a new vendor to replace CSX.  That vendor is a non-minority-owned

business.  *See* Compl. ¶ 33.

On August 20, 2012, having lost its chief source of revenue, NCL filed for

Chapter 11 bankruptcy.  (That bankruptcy has since been converted to Chapter 7.)

NCL filed the instant adversary action against CSX on September 27, 2012.

NCL's complaint alleges a single claim against CSX for violation of New

Jersey's Law Against Discrimination ("LAD").  Specifically, NCL alleged that

"CSX terminated the Agreement and refused to do business with NCL on account

of the race, creed, color, national origin, or ancestry of the owners, officers,

employees, agents, or business associates of NCL in violation of N.J.S.A. § 10:5-

12(*l*)" and that "CSX purposely provided NCL with less than two hours' lead time

and withheld information about instances where it expected increased demand so

that it could manufacture a breach and use it as a pretext to terminate the

Agreement with NCL."  *See* Compl. ¶ 38.

CSX has now moved to dismiss NCL's complaint on the grounds that: (1)

the LAD claim falls within the scope of the Agreement's arbitration clause; (2) the

Agreement's forum selection clause requires that this matter be brought in Florida;

and (3) NCL has failed to state a claim upon which relief may be granted.

## ARGUMENT

I.    **NCL's LAD Claim Is Not Subject To Arbitration Because It Falls
      Outside The Scope Of The Arbitration Clause.**

Under the Federal Arbitration Act, "[i]f any suit or proceeding be brought in

any of the courts of the United States upon any issue referable to arbitration under

an agreement in writing for such arbitration, the court in which such suit is

pending, upon being satisfied that the issue involved in such suit or proceeding is

referable to arbitration under such an agreement, shall on application of one of the

parties stay the trial of the action until such arbitration has been had in accordance

with the terms of the agreement, providing the applicant for the stay is not in

default in proceeding with such arbitration."  9 U.S.C. § 3.

To determine whether a dispute is arbitrable, "a court must address two

issues: (1) whether the parties formed an agreement to arbitrate; and (2) whether

the dispute in question falls within the scope of that agreement."  *Nationwide Mut.*

*Ins. Co. v. Cosenza*, 258 F.3d 197, 202 (3d Cir. 2001) (citation omitted).

There is no dispute that the parties agreed to arbitrate certain disputes.  The

issue here is the scope of that agreement and whether it includes NCL's LAD

claim.

Relying upon a "presumption of arbitrability," CSX contends that if the

factual allegations of a complaint "touch matters covered by the parties' contract,

then those claims must be arbitrated, whatever the legal labels attached to them."

*See* Def.'s Br. at 8.  Accordingly, CSX argues that because NCL's Complaint, and

the LAD claim it asserts, "touches" factual matters covered by the parties'

Agreement, NCL's LAD claim is necessarily subject to arbitration.

CSX's argument, however, ignores several relevant and binding Supreme Court opinions that have repeatedly stressed that arbitration is a matter of contract. The contract, not a touch test, determine whether an issue is arbitrable. That in turn requires interpretation of the contract. A presumption of arbitrability only comes into play in interpreting the contract if there is an ambiguity as to the scope of the arbitration clause. Otherwise, normal state law principles of contract law apply.

In this case, the parties chose Florida law to govern their agreement. Under Florida law, as expressed by the Florida Supreme Court, the language used by the parties in their arbitration agreement is not ambiguous. It has a limited meaning and cannot be interpreted to include or require arbitration of NCL's LAD claim for the reasons explained below.

### A.   The Decision Whether To Arbitrate, And The Scope Of Claims Subject To Arbitration, Are Matters Of Contract Determinable By The Parties.

The Supreme Court has repeatedly stressed that arbitration is matter of contract. As the Supreme Court has explained, the Federal Arbitration Act "does not require parties to arbitrate when they have not agreed to do so, nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement. It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their

terms." *Volt Info. Sciences v. Stanford University*, 489 U.S. 468, 478 (1989) (citations omitted). "For nothing in the statute authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002).

Stated differently, the Federal Arbitration Act "does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that 'arbitration proceed *in the manner provided for in [the parties'] agreement.'" Volt*, 489 U.S.at 474-75 (quoting 9 U.S.C. § 4) (emphasis and alterations on original).

In sum, the Supreme Court has established that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

### B.    Like Other Contracts, Arbitration Agreements Are Interpreted In Accordance With State Law.

In determining the scope of the arbitration clause, CSX contends this Court needs to apply a presumption of arbitrability and order arbitration if NCL's LAD claim merely "touches" matters covered by the parties' agreement.

As explained below, however, the presumption of arbitrability and the "touch" test CSX espouses play no interpretive role in this case. Because arbitration is a matter of contract, the Supreme Court has made it abundantly clear

12

that the terms of the parties' contract, as interpreted under state law, answer the

question of what claims are subject to arbitration.  *See, e.g., First Options of

Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the

parties agreed to arbitrate a certain matter . . . courts generally . . . should apply

ordinary state-law principles that govern the formation of contracts.").

### 1.   Because There Is No Ambiguity, The Presumption of Arbitrability Does Not Apply.

In interpreting the arbitration clause in the parties' agreement, CSX contends

there is a "presumption of arbitrability."  *See* Def.'s Br. at 6.  But the presumption

of arbitrability is not a principle of general application.  It has a limited role and

only applies when there is an ambiguity regarding the scope of the arbitration

clause.  It cannot be applied to broaden the scope of an otherwise unambiguous

arbitration clause.  To do so would violate the principle that "arbitration is a matter

of contract and a party cannot be required to submit to arbitration any dispute

which he has not agreed so to submit."  *AT&T Technologies v. Communications

Workers*, 475 U.S. 643, 648 (1986).  Accordingly, "[a]bsent some ambiguity in the

agreement . . . it is the language of the contract that defines the scope of disputes

subject to arbitration."  *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002).

As the Supreme Court explained in *Waffle House*:

> Because the FAA is "at bottom a policy guaranteeing the
> enforcement of private contractual arrangements," we look first
> to whether the parties agreed to arbitrate a dispute, not to

13

> general policy goals, to determine the scope of the agreement.
> While ambiguities in the language of the agreement should be
> resolved in favor of arbitration, we do not override the clear
> intent of the parties, or reach a result inconsistent with the plain
> text of the contract, simply because the policy favoring
> arbitration is implicated.  "Arbitration under the [FAA] is a
> matter of consent, not coercion."

*EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).

Thus, "[d]espite the liberal policy in favor of enforcing arbitration

agreements . . . a party cannot be forced to arbitrate unless 'that party has entered

into a written agreement to arbitrate that covers the dispute.'"  *U.S. Small Bus.*

*Admin. v. Chimicles*, 447 F.3d 207, 209 (3d Cir. 2006) (*quoting Bel-Ray Co. v.*

*Chemrite (Pty) Ltd.*,181 F.3d 435, 440 (3d Cir. 1999)).

The Supreme Court recently cautioned courts in *Granite Rock Co. v.*

*International Brotherhood of Teamsters*, ____ U.S. ____, 130 S.Ct. 2847 (2010),

to avoid over applying the presumption of arbitrability.  The federal policy

favoring arbitration of disputes, the Supreme Court explained, cannot be divorced

from the principle that arbitration is strictly a matter of contract.  The presumption

of arbitrability is available as an interpretive tool only "where a validly formed and

enforceable agreement is ambiguous about whether it covers the dispute at hand."

*Granite Rock*, 130 S.Ct. at 2858-59.  The presumption cannot override what the

parties have agreed to in their contract:

> [W]e have never held that this policy overrides the principle
> that a court may submit to arbitration "only those disputes . . .

14

> that the parties have agreed to submit." Nor have we held that
> courts may use policy considerations as a substitute for party
> agreement. We have applied the presumption favoring
> arbitration, in FAA and in labor cases, only where it reflects,
> and derives its legitimacy from, a judicial conclusion that
> arbitration of a particular dispute is what the parties intended
> because their express agreement to arbitrate was validly formed
> and (absent a provision clearly and validly committing such
> issues to an arbitrator) is legally enforceable and best construed
> to encompass the dispute.

*Id.* at 2859-60.

Here, CSX does not contend that the language the parties chose to use in

their arbitration agreement is ambiguous. Indeed, as explained below in Section

I.C.2, *infra* at 20, the language used by the parties has a clear and definite meaning

under Florida law. As a result, there is no ambiguity regarding its scope. And

because there is no ambiguity, there is no place for the application of the

presumption of arbitrability in this case. In accord with Supreme Court case law,

the language of parties' contract, not the presumption of arbitrability, determines

the scope of the arbitration clause.

> **2.     The Supreme Court Has Never Adopted A "Touch" Test
> For Interpreting The Scope Of An Arbitration Clause.
> Rather, Matters Of Interpretation Are Resolved In
> Accordance With State Law.**

CSX also contends this Court should apply a "touch" test to determine what

claims fall within the scope of the parties' arbitration agreement. *See* Def.'s Br. at

8. Under the "touch" test advanced by CSX, claims are arbitrable if the factual

allegations in support of the claim "touch" matters covered by the parties'

agreement.

The problem with this argument is that the Supreme Court has never adopted

the "touch" test as the method for determining the scope of an arbitration clause.

Instead, it has repeatedly reiterated that it is the terms of the parties' agreement as

interpreted under *state law* that determines the scope of arbitration.

The "touch" test advanced by CSX traces its roots to dicta in *Mitsubishi*

*Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985).  That this

was dicta cannot be disputed.  The issue in that case did not involve determining

the scope of the parties' arbitration agreement.  Rather, the issue was whether

policy reasons existed that justified excepting from arbitration statutory antitrust

claims that were otherwise encompassed within the scope of a valid arbitration

clause.  *See Mitsubishi*, 473 U.S. at 616 ("The principal question presented by

these cases is the arbitrability . . . of claims arising under the Sherman Act, 15

U.S.C. § 1 *et seq.*, and encompassed within a valid arbitration clause in an

agreement embodying an international commercial transaction.").

*Mitsubishi* involved a broad arbitration clause in a distributor agreement

between Mitsubishi and a car dealership in Puerto Rico.  The parties agreed to

arbitrate in Japan "[a]ll disputes, controversies or differences which may arise

between [them] out of or in relation to Articles I-B through V of [their] Agreement

or for the breach thereof."

On appeal before the First Circuit, the defendant dealership argued it never

specifically agreed to arbitrate statutory antitrust claims.  But the First Circuit

noted that the arbitration clause was not limited to contractual claims and instead

applied to "*all* disputes, controversies or differences" arising "out of" or "in

relation to" certain sections of the parties' agreement, as well as "for breach

thereof."  Thus, the issue was not whether the arbitration clause mentioned

antitrust claims, but whether the antitrust claim was a dispute, controversy, or

difference arising out of or in relation to the parties' agreement.  The First Circuit

held it was and thus the defendant's statutory antitrust claims fell within the scope

of the arbitration clause.

On appeal to the Supreme Court, the defendant did not contest the First

Circuit's interpretation of the scope of the arbitration clause.  Instead, it argued

"that as a matter of law a court may not construe an arbitration agreement to

encompass claims arising out of statutes designed to protect a class to which the

party resisting arbitration belongs 'unless [that party] has expressly agreed' to

arbitrate those claims."  *See Mitsubishi*, 473 U.S. at 625.

Thus, as the Supreme Court itself noted, it was not reviewing the First

Circuit's construction of the scope of the arbitration clause:

17

> We therefore have no reason to review the Court of Appeals'
> construction of the scope of the arbitration clause in the light of
> the allegations of [defendant's] counterclaims.

*See Mitsubishi*, 473 U.S. at 625 n.13.  But it did note that given the breadth of the

arbitration clause—"*all* disputes, controversies or differences" arising "out of" or

"in relation to" Articles I-B through V of the parties' agreement—that, "insofar as

the allegations underlying the statutory claims touch matters covered by the

enumerated articles, the Court of Appeals properly resolved any doubts in favor of

arbitrability." *Id.*

Thus, the Supreme Court never adopted a "touch" test in *Mitsubishi* as

displacing state law for determining the scope of an arbitration provision.  This is

confirmed by the Supreme Court's later decisions in both *Volt* and *Stolt-Nielsen* —

both of which were decided after *Mitsubishi* — where it reiterated and confirmed

that interpretation of arbitration agreements is a matter of state, not federal, law.

In *Volt*, a California state court had interpreted the parties' agreement as

incorporating California's rules of arbitration and, pursuant to California law,

stayed the arbitration pending resolution of related litigation.  The FAA has no

similar counterpart, and the plaintiff contended the state court erred in not

interpreting the agreement in accord with the FAA.  The Supreme Court, however,

noted that "the interpretation of private contracts is ordinarily a question of state

law, which [it] does not sit to review." *Volt*, 489 U.S. at 1989.  Having interpreted

18

the parties' agreement as incorporating California's arbitration rules, the Supreme

Court held that the state court did not run afoul of the FAA.  The FAA "simply

requires courts to enforce privately negotiated agreements to arbitrate, like other

contracts, in accordance with their terms."  *Id.* at 478.  The interpretation of those

terms, meanwhile, is a matter of state law.  *Id.* at 475-76.

More recently, the Supreme Court re-affirmed the preeminence of state law

in *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, ____ U.S. _____, 130

S.Ct. 1758 (2010), noting that "the interpretation of an arbitration agreement is

generally a matter of state law."  *Id.* at 1773.[1]

Thus reference to state law, and not some "touch" test, must be made in

interpreting the scope of the parties' arbitration agreement.

---

[1] In addition to not being adopted as the test for determining the scope of an
arbitration clause, application of the "touch" test cannot be divorced from its
contractual context.  The arbitration clause in *Mitsubishi* was broad.  It applied to
"*all* disputes, controversies or differences" arising "out of" or "in relation to" to
their agreement.  Thus, if the factual allegation of the claim "touched" the
agreement, then the claim necessarily would have been one "in relation" to the
agreement.  The "touch" test would have no application, however, in a case where
the parties agreed to arbitrate contract claims but not tort claims (even if the tort
claims "touched" matters covered by the contract), because, as the Supreme Court
has made clear, parties may contractually agree what claims are and are not subject
to arbitration.  *See, e.g., Volt*, 489 U.S. at 478 ("[T]he FAA does not require parties
to arbitrate when they have not agreed to do so, *nor does it prevent parties who do
agree to arbitrate from excluding certain claims from the scope of their arbitration
agreement.*").

**C.    As Interpreted Under Florida Law, The Agreement Does Not
Require The Arbitration Of The LAD Claim.**

    **1.    Florida, Not New Jersey, Law Governs The Interpretation
Of The Parties' Agreement.**

Even though the touch test does not apply as a matter of federal law, CSX

cites several New Jersey cases to seemingly argue that New Jersey law employs a

touch test to determine the scope of the parties' arbitration clause.  *See* Def.'s Br.

at 8.

Without arguing the merits of whether New Jersey law does or does not

subscribe to the "touch" test, the error with CSX's argument lies with the fact that

the Agreement is governed by Florida law.  Section 21(C) of the Agreement reads:

> This Agreement shall be governed by, and construed in
> accordance with, the laws of the State of Florida, without regard
> to any choice of law provisions thereof.

Florida law, therefore, not New Jersey law, determines the scope of the

parties' arbitration agreement.

    **2.    Florida Has Interpreted "Arising Under" Or "Related To"
To Only Require Arbitration Of Disputes Concerning
Contractually-Imposed Duties.**

Here, the parties agreed to arbitrate "all controversies arising out of or

connected with any default or breach" of their Agreement.

The Florida Supreme Court interpreted nearly identical language in *Seifert v.*

*U.S. Home Corp.*, 750 So.2d 633 (Fla. 1999), and held that the language was not

20

broad enough to include the arbitration of claims that concern breach of duties

imposed independent of or extraneous to the parties' contract.

In *Seifert*, the plaintiff brought a wrongful death claim against the company

that manufactured her home.  Her husband left the car running in the garage.  The

air conditioning system picked up the carbon dioxide emissions from the car and

carried them into the house, killing the plaintiff's husband.

The defendant manufacturer moved to arbitrate the wrongful death claim

under the arbitration clause in the sales contract for the home.  That clause required

arbitration of "any controversy or claim *arising under or related to* this

Agreement."  *Id.* at 635.

The Florida Supreme Court noted that "courts around the country . . . have

pronounced differing views on the interpretation of contracts and their arbitration

provisions" and that they have reached varying conclusions even when interpreting

identical language.  *See id.* at 636.

Having now the chance to address the matter itself, the Florida Supreme

Court said the fact that the parties have a "contractual relationship" is insufficient

to make any and all disputes between them one "arising out of or relating to" their

agreement:

> Disputes arise in many and varied contexts and the mere
> coincidence that the parties in dispute have a contractual
> relationship will ordinarily not be enough to mandate
> arbitration of the dispute.  In other words, the mere fact that the

21

> dispute would not have arisen but for the existence of the
> contract and consequent relationship between the parties is
> insufficient by itself to transform a dispute into one "arising out
> of or relating to" the agreement.

*Seifert*, 750 So.2d at 638.

To determine whether a dispute "arises out of or relates to" the parties'

agreement, the Florida Supreme Court said that a reviewing court needs to

determine whether the dispute concerns a breach of a contractually-imposed duty

or one imposed by law and generally owed to others besides the contracting

parties.  Only the former can be deemed to arise out of or relate to parties'

agreement and thus arbitrable:

> If the contract places the parties in a unique relationship that
> creates new duties not otherwise imposed by law, then a dispute
> regarding a breach of a contractually-imposed duty is one that
> arises from the contract.  Analogously, such a claim would be
> one arising from the contract terms and therefore subject to
> arbitration where the contract required it.  If, on the other hand,
> the duty alleged to be breached is one imposed by law in
> recognition of public policy and is generally owed to others
> besides the contracting parties, then a dispute regarding such a
> breach is not one arising from the contract, but sounds in tort.
> Therefore, a contractually imposed arbitration requirement . . .
> would not apply to such a claim.

*Seifert*, 750 So.2d at 640 (*quoting Dusold v. Porta-John Corp.*, 807 P.2d 526, 531

(Ariz. Ct. App. 1990).

Turning to the wrongful death claim before it, the Florida Supreme Court

concluded the claim was not subject to arbitration as a dispute arising under or

related to the parties' agreement, because the claim was predicated on a duty

unrelated to rights and obligations of the parties under their contract.  *See id.* at

641.  The parties had a contractual relationship, but the dispute did not concern or

relate to their contractual duties and obligations.  *See id.* at 642.

### 3. NCL's LAD Claim Is Not A Dispute "Arising Out Of Or Connected With Any Default Or Breach" Of The Agreement.

*Seifert* was decided in 1999.  The Agreement between NCL and CSX was

entered into in 2009.  The parties, therefore, are presumed to have drafted their

arbitration clause with knowledge of *Seifert.*

With that knowledge, they drafted their arbitration agreement to only cover

"controversies arising out of or connected with any default or breach" of the

Agreement.

Under *Seifert*, this is a narrow arbitration clause.  The parties did not agree

to arbitrate "any and all disputes" between them.  Rather, they only agreed to

arbitrate disputes "arising out of or connected with any default or breach" of their

Agreement.

Thus, this Court needs to employ the *Seifert* analysis to determine whether

NCL's LAD claim concerns the breach of a contractually-imposed duty (such that

it can be deemed to arise under or relate to the Agreement) or one imposed by law.

The answer is clear.  NCL is not suing CSX for breach of an obligation owed under their Agreement.  In fact, there is *no agreement* between them.  That is the crux of the dispute.  CSX is being sued under the LAD, not because it breached the contract, but for *refusal* to contract.

NCL acknowledges that under their Agreement CSX had the right to terminate with 120 days' notice.  NCL does not contend that CSX breached the Agreement by doing this.  NCL contention is that, although CSX had a contractual right to terminate agreement, it did so for reasons that are illegal — not under the contract — but under the LAD.

In relevant part, the LAD provides that it shall be "unlawful discrimination" for "any person **to refuse to** . . . **contract with** . . . **or otherwise do business with any other person on the basis of race, creed, color, national origin, ancestry**."  N.J.S.A. § 10:5-12(*l*).  This is the obligation NCL contends CSX breached, not their Agreement.

Indeed, it is difficult to view NCL's LAD claim as "arising out of or connected with any default or breach" of the Agreement when the very nature of dispute is the *absence* of an agreement on account of CSX's refusal to contract.  If the dispute is that there is no contract, then the LAD claim cannot be one "arising out of or connected with any default or breach" of the (non-existent) agreement.  *See, e.g., Granite Rock*, 130 S.Ct. at 2862 (dispute about whether parties in fact

24

had an agreement is not subject to arbitration as a dispute "arising under" the agreement).

Thus, like in *Seifert*, the fact that the parties had a contractual relationship does not transform all disputes between as "arising out of or relating to" their Agreement. Had they wanted to arbitrate all disputes between them, all they had to do was write that "any and all disputes" shall be arbitrated and *Seifert* would not apply.

But they didn't. Instead, they limited the scope of arbitration to "controversies arising out of or connected with any default or breach" of the Agreement. And under Florida law, as established in *Seifert*, that language means they only agreed to arbitrate disputes that concern breach of contractually-imposed obligations. The LAD is not a contractually imposed obligation, and therefore it is not arbitrable.

## II.    Venue In This District Is Proper Because The Florida Forum Selection Clause Does Not Apply.  NCL's LAD Claim Is Not An Action "Arising From, Or Brought To Enforce," The Parties' Agreement.

Section 23(C) of the Agreement provides states that "[t]he exclusive venue for any judicial action arising from, or brought to enforce, this Agreement shall be a state or federal court  of competent jurisdiction located in Jacksonville, Florida."

The applicable scope of a forum selection clause is governed by general principles of contract law. *See John Wyeth & Brother Ltd.v. Cigna Int'l Corp.*, 119

F.3d 1070, 1073 (3d Cir. 1997) ("The question of the scope of a forum selection clause is one of contract interpretation.").

The starting point then is with the text of the clause.  "[W]hether or not a forum selection clause applies depends on what the specific clause at issue says." *John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070, 1075 (3d Cir. 1997).

Here, the clause provides that Florida shall be the forum for any judicial action (1) "arising from" the Agreement or (2) "brought to enforce" the Agreement.  As described above, NCL's LAD claim is not a claim seeking enforcement of the Agreement.  Accordingly, the question then is whether the LAD claim is a claim "arising from" the Agreement.

In interpreting the forum selection clause at hand, "[d]rawing analogy to other cases is useful only to the extent those other cases address contract language that is the same or substantially similar to that at issue."  *Wyeth*, 119 F.3d at 1075.

For example, in *Wyeth*, the forum selection clause covered any claims "arising in relation to" the parties' agreement.  The Court reasoned that the phrase "arising in relation to" is broader than the phrase "arising under" because the former clause extends to any action having some "logical or causal connection" to the agreement, while the latter only covers disputes growing out of the agreement. *See id.* at 1074-75.  Accordingly, the Court read the forum selection clause in that

26

case as covering claims that did not directly arise out of the agreement but were otherwise related to it.  *See id.*

By contrast, in *Phillips v. Audio Active*, 494 F.3d 378 (2d Cir. 2007), statutory copyright claims, though related to the parties' record contract, were found not to be covered by a forum selection clause that applied only to claims that "arise out of" the contract.  To "arise out of," the Court said, meant to "originate from a specified source."  *Id.* at 389.  The copyright claims, the Court explained, did not originate from the parties agreement but rather from the plaintiff's authorship of the works in dispute.  *See id.* at 391.  Therefore, the copyrights claims did not fall within the scope of the forum selection clause.

Similarly, in *Alvater Gessler v. Sobieski Destylarnia*, 572 F.3d 86 (2d Cir. 2009), the parties had a licensing agreement that called for "any disputes resulting from" the agreement to be heard in Poland.  Plaintiff alleged defendants continued to use its mark after the termination of the agreement and asserted trademark and related claims.  The Court found they were not covered by the forum selection clause because the claims were "not based on rights originating from the licensing agreements."  *Id.* at 91.

The forum selection clause here is more like the forum selection clauses in *Gessler* and *Phillips* than *Wyeth*.  Unlike *Wyeth*, the parties' forum selection clause does not include claims "relating to" the Agreement.  Rather, similar to *Gessler*

27

("resulting from") and *Phillips* ("arising out of"), the forum selection clause is limited to claims "arising from" the Agreement. And like the language at issue in *Gessler* and *Philips*, "arising from" means to originate from some specified source.

Accordingly, like the trademark and copyright claims in *Gessler* and *Phillips*, NCL's LAD claim does not originate from the Agreement, as CSX is not being sued for violating some right or obligation arising or originating from the Agreement. As explained in the preceding section relating to the arbitration clause, NCL's LAD claim is premised on the fact that there is no agreement; CSX is being sued for its *refusal* to contract or do business with NCL. Accordingly, the dispute does not arise from the Agreement, it arises from CSX's refusal to deal. The duty CSX breached — the duty not to discriminate on account of race — is a duty that arises from the LAD, not the Agreement.

Again, like with the arbitration provision, had the parties intended to subject all claims to the forum selection clause all they had to do is remove the qualifiers from the clause and state that "any and all claims" shall be brought in Florida. Instead, they limited the reach of the forum selection clause to claims "arising from" the Agreement. As such, because NCL's LAD claim is not a claim "arising from" the Agreement, it is not subject to the forum selection clause.

### III.  NCL Has Stated A LAD Claim That Passes The *Twombly/Iqbal* Plausibility Standard.

#### A.  The "Prima Facie Case" Is Not A Pleading Standard.

CSX contends that NCL cannot state a claim because it failed to plead a "prima facie" case.  *See* Def.'s Br. at 14.  The "prima facie" case is an element of the three-part *McDonnell Douglas* burden-shifting model that New Jersey adopted from the federal courts in applying analogous federal civil rights legislation:

(1)    the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination;

(2)    the defendant then must show a legitimate non-discriminatory reason for its decision; and

(3)    the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.

*Dixon v. Rutgers, The State Univ. of N.J.*, 110 N.J. 432, 442 (1988).

The Supreme Court, however, specifically addressed the very argument CSX makes here in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), and held that a plaintiff is not required to establish a prima facie case at the pleadings stage.  "The prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement."  *Id.* at 510.

The Court noted that the *McDonnell Douglas* framework does not even apply in every discrimination case.  "[I]f a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a

prima facie case. . . .  It thus seems incongruous to require a plaintiff, in order to

survive a motion to dismiss, to plead more facts than he may ultimately need to

prove to succeed on the merits if direct evidence of discrimination is discovered."

*Id.* at 511-12.

The Court also noted that "the precise requirements of a prima facie case can

vary depending on the context" and that, "[b]efore discovery has unearthed

relevant facts and evidence, it may be difficult to define the precise formulation of

the required prima facie case in a particular case.  Given that the prima facie case

operates as a flexible evidentiary standard, it should not be transposed into a rigid

pleading standard for discrimination cases."  *Id.* at 512.  Rather, the Court said,

discrimination cases, like most other cases, "must satisfy only the simple

requirements of Rule 8(a)" and give a defendant fair notice of the claim.  *Id.*

While *Swierkiewicz* was decided before *Twombly* and *Iqbal*, the Court made

an effort in *Twombly* to make clear that its holding did "not run counter to

*Swierkiewicz*," that it was "not requiring heightened fact pleading of specifics, but

only enough facts to state a claim to relief that is plausible on its face."  *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

As District Judge Thompson recently noted, "'[r]econciling *Swierkiewicz*,

*Twombly*, and *Iqbal*, a complaint need not establish a prima facie case of

employment discrimination to survive a motion to dismiss; however, the claim

must be facially plausible and must give fair notice to the defendants of the basis for the claim.'" *Huggard v. Crown Bank*, 2012 WL 529548 (D.N.J. Feb. 17, 2012) (quoting *Barbosa v. Continuum Health Partners Inc.*, 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010)). *See also Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir.2012) ("The Supreme Court's subsequent decisions in *Twombly* and *Iqbal* did not alter its holding in *Swierkiewicz*."); *al-Kidd v. Ashcroft*, 580 F.3d 949, 977 (9th Cir. 2009) ("*Twombly* and *Iqbal* do not require that the complaint include all facts necessary to carry the plaintiffs burden.").

## B.   NCL Has Stated A Plausible Claim That CSX Refused To Contract With It In Violation Of LAD.

CSX has been sued under a provision of the LAD that makes it unlawful for "any person *to refuse to* buy from, sell to, lease from or to, license, *contract with*, or trade with, provide goods, services or information to, *or otherwise do business with any other person on the basis of race, creed, color, national origin, ancestry, age, sex* . . . of such other person or of such other person's spouse, partners, *members, stockholders, directors, officers, managers, superintendents, agents, employees*, business associates, suppliers, or customers." N.J.S.A. § 10:5-12(*l*).

There is no analog under the federal civil rights statutes to this particular provision of the LAD and only a few cases have interpreted it. As interpreted, "it prohibits refusals to do business with independent contractors based on age, sex, or

31

handicap." *J.T.'s Tire Service v. United Rentals*, 411 N.J. Super. 236, 240 (App.

Div. 2010).

In *Rubin v. Chilton*, 359 N.J. Super. 105 (App. Div. 2003), two doctors sued

the hospital with which they had a contract contending the hospital terminated the

contract on account of their age in violation of N.J.S.A. § 10:5-12(*l*).  The

Appellate Division said such allegations violated LAD:

> Plaintiffs contend their contract was terminated because of their
> age.  If they can show this was so, it would seem to be a refusal
> to contract with, or perhaps, continue to contract with them on
> the basis of age, in contravention of this statute.  This
> conclusion is compelled by the plain language of the statute.
> Absent a clear indication to the contrary, language in a statute is
> to be read in accordance with its plain and ordinary meaning.
> To distinguish between a refusal to enter into a contract and the
> termination of a contract where the motivation is illegal
> discrimination would mock the beneficial goals of the LAD,
> remedial legislation which should be liberally construed to
> advance its beneficial purposes.  If, for example, an
> organization refused to enter into a contract with an architect
> solely because the architect was a woman, violation of N.J.S.A.
> 10:5-12l could not be doubted.  The same result must follow if
> the architect's contract is terminated solely because the architect
> is a woman.

*Id.* at 110.

Similarly, in *United Rentals*, the court found a violation of this section to

have been stated when the plaintiff alleged the defendant stopped doing business

with her when she refused to submit to the sexual demands of its branch manager.

*United Rentals*, 411 N.J. Super. at 242.

Not surprising, CSX did not say it was terminating the Agreement because NCL was a minority owned and operated business.  "'Smoking gun' proof of discrimination is rarely available, especially at the pleading stage." *Grajales v. Puerto Rico Ports Authority*, 682 F.3d 40, 49 (1st Cir. 2012).  But such proof is not needed at the pleadings stage.  The plausibility threshold "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the illegal conduct." *Twombly*, 550 U.S. at 556.

Here, NCL alleged that it and its predecessor company had provided taxi service for NCL for nearly a decade without issue.  In 2009, there was a change in management at the Selkirk location where the Agreement was administered and Mr. Gaylord was brought on.

Starting with Mr. Gaylord's arrival, CSX increasingly provided NCL with less than two hours' lead time, giving NCL an hour and five minutes, rather than two hours and five minutes, to make the requested pickup on time.

At around the same time, Mr. Gaylord was heard to have derogatorily make note of the fact that NCL utilized primarily minority drivers and roll his eyes when NCL would bring in a minority applicant to the Selkirk facility to interview.

In addition, Mr. Gaylord would refuse to meet with NCL's CEO, who was African-American.  He would travel from his office in Hainesport, New Jersey to meet with Mr. Gaylord at the Selkirk facility only to show up and discover with no

advanced notification that Mr. Gaylord was not there or otherwise unwilling to meet.

At the same time, NCL employees and agents began hearing rumors from the CSX train crews they were transporting that Mr. Gaylord was out to get them (NCL) and that NCL would not be around much longer.

In addition, whereas in the past, CSX would communicate with NCL in advance locations where it anticipated increased activity and thus an increased need for NCL's services so NCL could pre-position resources, Mr. Gaylord ceased all such communications with NCL.

All the while, the number of calls where less than two hours' notice was provided continued to increase to the point where they accounted for nearly half of all calls received.

Mr. Gaylord even evicted NCL and its staff from the facility it shared with CSX on the grounds it smelled and was dirty, even though the space was cleaned by the same cleaning staff that cleaned CSX's portion of the building.

When NCL met with CSX officials in Jacksonville to discuss the problems with Mr. Gaylord, it was a CSX official who suggested to NCL that its problems with Mr. Gaylord were racially motivated. And when NCL was terminated, it was replaced by a non-minority-owned company.

34

To survive a motion to dismiss, a complaint must contain sufficient factual
matter, accepted as true, to "state a claim to relief that is plausible on its face."
*Twombly*, 550 U.S. at 570. The plausibility standard is not akin to a "probability
requirement." A claim has facial plausibility when the plaintiff pleads factual
content that allows the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged. *Id.* at 556.

Here, NCL and its predecessor, W&W Transportation, had provided service
to CSX for nearly a decade without issue. When Mr. Gaylord came on board, the
relationship deteriorated. That deterioration of the relationship, coupled with the
comments and actions of Mr. Gaylord relating to NCL's use of minority drivers,
the unexplained increase in calls where less than two hours' lead time was given,
and the suggestion that the CSX officials made that NCL's problems were racially
motivated,[2] makes NCL claim that CSX's refusal to contract with it was on
account of the race of its officers, employees, and agents plausible. The Court may
disagree about the strength of NCL's claim and its probability of success, but it has
alleged enough facts that, when accepted as true, give rise to an inference that race

---

[2] *See Rhodes v. R&L Carriers, Inc.* ___ Fed. Appx. ___, 2012 WL 3156437 (6th
Cir. Aug. 6, 2012) ("Given the allegation that [defendant's] employees made
express statements regarding the unlawful use of age in the hiring process, we
conclude that [plaintiff] has satisfied the plausibility requirement.").

played a role in CSX's refusal to do business with NCL.  Accordingly, it has stated a claim for purposes of Rule 12(b)(6).

## CONCLUSION

For all of the foregoing reasons, Defendant CSX Transportation, Inc.'s motion to dismiss should be **DENIED.**

Respectfully submitted,

Dated:  February 1, 2013

*/s/ Philip B. Seaton*
PHILIP B. SEATON
LAW OFFICE OF PHILIP B. SEATON
One Greentree Centre
10000 Lincoln Drive East, Suite 201
Marlton, New Jersey 08053
(856) 988-5516

JEFFREY D. VANACORE
PERKINS COIE
30 Rockefeller Plaza, 25th Floor
New York, New York 10112
(212) 262-6900

Attorneys for Plaintiff
North Connections Logistics, Inc.

36